USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/26/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    Honorable Sidney H. Stein

- - - - - - - - - - - - - - - - - - - - - - - - X

PETER W. LINDNER,                                10 Civ. 2267 (SHS-AJP)

               Plaintiff,                  **PLAINTIFF CROSS-MOTION AND**
**REPLY TO AMEX RESPONSE ON**
     -against-                              **ORDER TO SHOW CAUSE**

AMERICAN EXPRESS COMPANY
               Defendants

- - - - - - - - - - - - - - - - - - - - - - - - X

Friday, March 26, 2010

**PRO SE OFFICE**

Plaintiff Cross Motion and Reply ................................................................ 2
   Should Deception be Rewarded? .......................................................... 3
   My new Job .......................................................................................... 3
   Ben Hur Moving Company ................................................................... 4
   The Point .............................................................................................. 4
Memo of Law ............................................................................................... 8
   My new Job .......................................................................................... 8
   The Sexual Harassment History ........................................................... 9
   Lindner informs Ash Gupta by certified mail ....................................... 11
   The Tempermentals ............................................................................. 14
   NY Judiciary Law §487 ....................................................................... 15
   RICO Statute ....................................................................................... 17
   Lehman Brothers – illegal acts? .......................................................... 21
   Amex has intended to deceive the Court. ............................................. 23
Affidavit ...................................................................................................... 25
Exhibit 1:  11 page document from email to Joe Sacca from Peter Lindner Tue 3/16/2010 6:17 PM,
entitled "Joe --Are you weaseling out of this.pdf" ........................................ 30
Exhibit 2A:  Third Email Request May 1 2009 to Jean Park by Lindner requesting the April 26 2009
Shareholder meeting Transcript & DVD ....................................................... 31
   Exhibit 2B:  March 5 2010 Email of Jean Park giving Lindner's attorney the April 2009 Transcript.. 33
Exhibit 3A:  Letter from Lindner to Ash Gupta of Feb 10 2006 ...................... 34
Exhibit 4A:  Complaint filed to NY Attorney General Cuomo about deceptive practices of Amex .......... 36
Exhibit 4B:  Complaint filed to Federal Trade Commission about deceptive practices of Amex .............. 37

(please note the due to the additional pages of the Exhibits 3 and 4, the page numbering is not workable)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    Honorable Sidney H. Stein
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PETER W. LINDNER,                                10 Civ. 2267 (SHS-AJP)
                              Plaintiff,

                                                 PLAINTFF CROSS-MOTION AND
         -against-                               REPLY TO AMEX RESPONSE ON
                                                 ORDER TO SHOW CAUSE

AMERICAN EXPRESS COMPANY
                        Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                              Friday, March 26, 2010
                              Via fax and email

**Plaintiff Cross Motion and Reply**

To The Honorable USDJ Stein,

    The matter on this Order to Show Cause is simple justice:  last year Amex allegedly lied and conspired to deceive the Court in order to stop a legitimate Shareholder Proposal to get onto the American Express ("Amex") proxy.  In order to stop such misbehavior from officers of the court, this year the Court should compel Amex to contain both the Shareholder Proposal and the nomination of me (Plaintiff Peter Lindner) which is needed to make sure the Shareholder Proposal is properly implemented.

    I note with satisfaction and disgust that Amex caused this problem a decade ago by allowing their closeted homosexual manager to prey on me and others, and not only get away with his actions, but then reward him for it and allow him to do so despite an explicit document signed by Ash Gupta, now the President of Banking at Amex, that ought to have prevented Qing from both sexually harassing me and from violating Title VII of the Civil Rights Act of 1964 by retaliating against an employee.  In so doing, Amex's vaunted Code of Conduct has failed for a decade, and Amex actively tries to stop its employees and Shareholders from recognizing the rot within its organization and its ostensible leaders.

    This Shareholder Proposal of mine is a cry for freedom and human dignity in the face of a perverted manager Qing and in the acquiescence and then active collaboration of Qing's peers, subordinates and superiors, both privately and publicly.  I say Qing is perverted, with no offense meant to sodomites or pedophiles, but in the sense of taking something that is good and perverting it into his own evil and wrongness. I was a member of the Gay and Lesbian employees at Amex in the heady 1990's, in which that spirited group got Amex to revise their policies to recognize gay marriage.  Perhaps because Qing recognized I was gay, he felt that he could with impunity sexually harass me, and with impunity deny it, and with impunity could cover it up and retaliate years later.  And Qing might be right, for Qing has been handsomely paid as his mentor of 15 years, Ash Gupta, now the President of Banking at Amex, dragged Qing up with him and protected Qing from accountability.   I feel there are many parallels with the Catholic Church's cover-up and shielding from the police the priests who not only molested young boys, but did so with impunity and continued to do so at other locations for years, with official denials, obstructionism, and mere words offered to atone for wrongs done.

    Unlike the Church (disclosure: I am Jewish, but an atheist), I feel that a private or public company can heal the wrongs done by its employees, wittingly or not, over the course of decades where our current compassion and understanding should guide us on how to treat our fellow men, and then women, and then all the other groups which used to be called minorities. I saw a play "The Temperamentals"[1] in which a gay was

---

[1] See Memo of Law for description.

arrested in the 1950's on a false charge of sexually groping a policeman, and the innocent gay won with a split jury, when it was revealed that the officer noted in his arrest record: NHI. "No Humans Involved." NHI was the term for blacks, gays, and others who were not considered human and therefore the police command would not care what was done to them.

## Should Deception be Rewarded?

In my opinion, Mr. Joe Sacca, Esq. of Skadden, Arps, Slate, Meagher & Flom LLP, who represented Amex last year along with Ms. Jean Park, Esq. of Kelley Drye & Warren LLP, worked together to deceive The Court: Mr. Sacca was uninformed, and Ms. Park never corrected him. In my opinion, there is no doubt whether Mr. Sacca should be held to a standard of due diligence, such as turning to Ms. Park and asking her whether my statements were true or not. Moreover, I sent Mr. Sacca a series of emails this month which showed that indeed Mr. Sacca deceived the Court in April 2009 by saying that Amex had never stopped me (Plaintiff Lindner) from communicating with the SEC prior to April 2009. In fact, Ms. Park was instrumental in getting The Honorable Magistrate Judge Katz to force me to stop communicating with the SEC under possible contempt of Court. And Ms. Park then arranged to have those transcripts and evidence sealed. So we have here a case of a clear attempt by Ms. Park to deceive the court, which is punishable under NY Judiciary Law §487 as a criminal misdemeanor and subject to treble damages under a separate civil suit, I believe. Under NY Judiciary Law §487, it does not matter whether the attempt was successful or not, which has been verified[2] in the US Court of Appeals for the Second Circuit *Amalfitano v. Rosenberg* 06-2364-cv. In fact, Amex's actions last year delayed me, which had the dual effect of helping Amex keep Shareholders from knowing about my Shareholder Proposal in advance, and also increase their billings.[3]

## My new Job

In order to put this in perspective, I note that due to Qing and Amex's actions, I have lost more than 1 job / career in my life. I think I was just given a job offer today, and don't want to ruin it by going to court and being late or absent for work. I thus ask the Court's indulgence since I may start April 5th, 2010 that such distractions could kill my new job, and I've been unemployed for about 7 ½ months in NYC, which to the uninitiated, is a long time to live **in Manhattan** without an income. So, I hope we can sometimes schedule after 5pm.

This case is about Amex's violation of my right to find and keep employment, and whether this action by Qing was an isolated incident or a part of string of incidents which have been covered up by payments to the injured party, or worse, by intimidation by Amex.

In the Memo of Law, I discuss the chain of events that ended my promising and fun career in Amex after being there for 9 years with a number of people who liked me and liked working with me. I also discuss why my personal story is a compelling reason for examining institutionally whether Amex has violated not only my rights as a citizen of the US, and as an employee and former employee of Amex, but also of the norms of decency for a Corporate Citizen, and for a company that ostensibly protects its workers, and definitely did so in

---

[2] The US Court of Appeals for the Second Circuit stated that

[3] In Rozen v Russ&Russ, the attorneys' misconduct before the court increased their billings and made the parties have increased expenses and delays:

> "It is alleged that the conduct of the moving parties undermined the integrity of the judicial process and increased the legal fees of the plaintiffs" and specifically that ": "It was the intention of the Russ & Russ Attorneys to take the option to the Mattituck property from the Omars and then cause the Rozens to incur extensive delays and expense"
> Posted In Legal Malpractice News

http://blog.bluestonelawfirm.com/cat-legal-malpractice-news.html

the years I was there in the Amex gay/lesbian employee group which got equal rights for gays who married (adoption rights, spousal medical benefits). Despite that, and maybe because of that, I can not get support of gay organizations, since Amex is a 'gay friendly' company, and there are few of those around who help out gay organizations, and those organizations don't want to bite the hand that feeds them. I'm not a sociologist, but I think this is a classic example of using power towards bad ends, whether it's US Supreme Court Justice Clarence Thomas' well documented abuses of his colleague / inferior Anita Hill, who had to put up with the sexual harassment since it is a hard place to succeed in, and tougher if you're black and you're female. And also if there are power relationships, as in FischerJordan working as a vendor and unable to tell the truth to me or to the Courts about what happened, since they are beholden to Qing Lin for their contracts, and Amex is their biggest customer.

## Ben Hur Moving Company

Why does Amex cite this obscure case? Well, perhaps it was a sycophant's attempt to curry favor with The Honorable USDJ Koeltl who wrote that opinion:

> ""Irreparable harm is defined as 'certain and imminent harm for which a monetary award does not adequately compensate. '" *Ben Hur Moving* & *Storage, Inc.* v. *Better Bus. Bureau of Metro. N. Y., Inc.,* No. 08 CIV 6572, 2008 WL 4702458, at *6 (S.D.N.Y. Oct. 3,2008) (quoting *Wisdom Imp. Sales Co.* v. *Labatt Brewing Co.,* 339 F.3d 101, 113 (2d Cir. 2003) (citation omitted))."

which is actually "**No. 08 CIV 6572(JGK)**", but that would be too transparent as a bid to appeal to His Honor's consistency and His Honor's wisdom and vanity. The case also invokes the civil portion of the RICO Act.[4]

Amex has filed 390 pages, and then there are the transcripts, orders, opposing briefs, which Your Honor has not seen.

In my opinion, Your Honor does not need to read them, although it would certainly be advisable, and I would have a lot to give Your Honor, also.

But let's get straight to the point:

## The Point

The Securities and Exchange Commission has given The Court the freedom to do what it wants in preference over its "informal views" "regarding Shareholder Proposals" in the SEC's Feb 2, 2010 letter cited by Amex . The SEC continues:   "Only a court such as a U.S. District Court can decide whether a company is obligated to

---

[4] However, that may be appropriate here, in view that Amex has met the 3 requirements of a RICO violation:

- A criminal activity, under 18 U.S.C. § 1961(1), e.g. "fraud in the sale of securities" (CEO Chenault misrepresenting the facts in the April 2009 Amex Shareholder meeting and Amex's attorneys violating NY Judiciary Law §487 on intent to deceive The Court in NY State, and lying to the SEC that the issue was ordinary business when they knew it was discrimination.
- Long term, not one shot:  this has continued for over 4 years.
- Not barred by the statute of limitations
  http://www.ricoact.com/ricoact/index.asp

See Memo of Law for this area.

include shareholder proposals in its proxy materials." And this court has the power, the authority and the right to undo a wrong caused by Amex and perpetuated over a period of 4 years.

## DIVISION OF CORPORATION FINANCE
## INFORMAL PROCEDURES REGARDING SHAREHOLDER PROPOSALS

[...]

It is important to note that the staff's and Commission's no-action responses to Rule 14a-8(j) submissions reflect only informal views. The determinations reached in these no-action letters do not and cannot adjudicate the merits of a company's position with respect to the proposal. Only a court such as a U.S. District Court can decide whether a company is obligated to include shareholder proposals in its proxy materials. Accordingly a discretionary determination not to recommend or take Commission enforcement action, does not preclude a proponent, or any shareholder of a company, from pursuing any rights he or she may have against the company in court, should the management omit the proposal from the company's proxy material.

Amex has had years to investigate and clean up the injustices, **which could have been done by requiring their employee to write a single memo on the subject**. What was missing was the incentive for Amex to look into the matter.

I tried to reason with Joe Sacca, Esq. of Skadden, Arps, Slate, Meagher & Flom LLP that he wrongly stated that Amex never tried to stop me from communicating with the SEC (one of many emails to Mr. Sacca appear in Exhibit 1). But Mr. Sacca said that he works for Amex and that he did no wrong. I realized that Mr. Sacca was not "incentivized" to find nor to fix his errors. I am urging Your Honor to incentivize Mr. Sacca and Skadden, Arps, Slate, Meagher & Flom LLP and American Express to correct their wrongs by making them pay both in cash, and in the embarrassment that Amex is being forced to do the right thing, instead of having done it on its own when it was pointed out to them. As for Ms. Park, I believe she can not be incentivized in the short term (unlike Amex, Skadden, and Joe), and Ms. Park should be found to have deceived the court and blocked the clear intent of the SEC, and Ms.Park should therefore be separated from the practice of law in the Southern District of New York. In my opinion, Ms. Park has orchestrated the denial of access to discovery information, of videos to Amex Shareholders, of the Court to the Truth, and allowed wrong-doers (Qing, Jason Brown, Ash Gupta, Stephen Norman, and their managers) to escape reprimand, let alone be monetarily punished.

People hate bankers. This may be part of the reason.

Amex could have mitigated its expenses by including the Shareholder Proposal, which after all is not binding on the management, but is merely **a vote by the company's owners** on binding on the management.

Amex is too cute by a half in trying to stop all publicity on this matter, especially in not turning over their "publicly available" transcript of the April 2009 Shareholder Meeting so that I could quote CEO Ken Chenault's response to me, nor the videotape of that, nor even the videotapes of Qing's admission under oath in January 2009 which I paid over $1,000 for with a certified videographer and stenographer only to have Amex get the Court to confiscate the tapes since ostensibly there is no need for them.

Well, Your Honor, some would say that justice is a need in America, and some would say truth in SEC filings, truth in court matters about the SEC activities, and public dissemination of information such as videos (e.g.

5

since JFK's assassination, the Viet Nam war, Presidential Debates, and YouTube) have all become a source of justice in the USA. Surprisingly, in Iran, the mullahs would agree with Amex that the videos are not needed, and that as Mr. Sacca so artfully includes in his affidavit of Secretary of the Corporation Carol Schwartz, Esq.,:

> "(d) confuse many of American Express' shareholders, particularly if they are presented with multiple, apparently similar proxy materials arriving at different times; and
> (e) invite negative attention by the press and others, which may negatively impact American Express' reputation and goodwill."[5]

Actually, for a sworn statement that does not qualify for matters of opinion, and signed by a member of the bar, Ms. Schwartz's declaration is laughable. Elections and voting are confusing, and that was a reason why the election in Iraq was so amazing last month: the outcome was in doubt. However, Amex is not Iraq, since Iraq's voting was in doubt, and last year Amex's voting had 900million against me, and if I had gotten 1million votes, that would mean I got 1/10 of 1%. Unfortunately, I only got 3,000 votes. So if I got 3,000 times more votes, I would have had 1% of the votes. Amex does not like surprises, just like Iran. So there is a difference between Iran and Iraq, which is more than its last letter.

In my opinion, Amex's filing with the Court is an affront to Shareholders' intelligence, especially Ms. Schwartz's sworn statement that Shareholders get confused with a revised ballot and that attempts to look into stopping discrimination "invite negative attention by the press and others, which may negatively impact **American Express'** reputation and goodwill". Under that standard, protest marches for equality by Blacks in the South or to stop the Viet Nam War or to Ban the Bomb also "invite negative attention by the press and others, which may negatively impact **America's** reputation and goodwill"

And I think again at item 8c in Ms. Schwartz's Declaration, which must be horribly inconvenient to those nominees for directors who expected that they would be coronated, and now are subject to a vote. It is hard to believe that in the USA, about half of the people who run for office do not win, quite unlike the Amex Directors.

> "[8. c] disrupt the schedules of American Express shareholders, directors, officers, and other company representatives who have already made plans to attend the Annual Meeting on its regularly scheduled date;"
> [Ibid.]

I would suggest that many of the people who come to the meeting in NYC already live or work near NYC, and that unlike many other places, it is not hard to move a reservation to NYC to a different day. However, surely Amex would be a little more quantitative than that: after all, their entire business runs on quantitative assessments of money and the probability that people will default on them (risk management, which I worked in at Amex during the 1990's and in the same group managed by Ash Gupta). Given that Amex is concerned about the costs involved to the attendees, maybe a larger amount of consideration should be afforded to those employees who are harmed by the flaws in the Amex Code of Conduct (in my opinion), who are basically those who can least afford it. So, I would say, using the word "progressive" in the tax sense of not being regressive, I think rescheduling the Amex Shareholder meeting and allowing a fully informed vote on a Shareholder Proposal about examining discrimination would be beneficial to the poorest and least powerful among us, and less helpful to the richest among us – and that is a good way to go. But also: it would affirm to the Amex Shareholders their right to decide an issue that the SEC grants the Shareholders as significant social policy, e.g. discrimination, and not merely "ordinary business," as Amex has claimed last year and previously, if I'm not mistaken (but Amex surely was and is mistaken). Moreover, this could be a wake-up call for other NYSE (NY Stock Exchange) companies to encourage them to hire / promote / fire without discrimination, and to not file

---

[5] Item #8 in "Declaration Of Carol V. Schwartz"

false documents to the SEC or give meaningless pablum idealistic Codes of Conduct that are neither enforced nor meant seriously. If Amex's Code is working well, then the Truth Commission would establish that, which is good publicity for Amex. If the Code is deficient, then a Truth Commission would find out how bad it is, and what can be done, and again Amex could shine if it attempts to rectify all the things that they should[6].

I thus counter that Amex should send out the (roughly 2,000) Shareholders who together own 50% of Amex, and to the employees and former employees of Amex who at least will recognize that a Shareholder Proposal on discrimination against employees is worth looking at and voting for (or against!).

I suggest that also American Express should give Peter Lindner an amount equal to **triple** the difference between the least and the greatest estimate provided by Amex to the SEC on costs of mailing, so that 1/3 of that can be given personally to me, and 2/3 can be used to pay for other expenses in connection with making the website, proposal and publicity, plus lawyer's costs. The reason for that is Amex could have included the Shareholder Proposal last year, or having allegedly lied to The Court in April 2009, could have atoned by including said Proposal this year without additional costs.

By: _____  3/27/2010

Peter W. Lindner
Plaintiff, *Pro Se*
1 Irving Place, Apt. G-23-C
New York, New York 10003
Home/ Fax:     212-979-9647
Cell:          917-207-4962
Email:         nyc10003@nyc.rr.com

---

[6] With apologies to The Beatles, "Think for Yourself," which is about believing lies:

"1965 album Rubber Soul. Written and sung by George Harrison, it is a warning against listening to lies.[1] In his book I Me Mine he writes, "But all this time later, I don't quite recall who inspired that tune. Probably the government."[1]"
http://en.wikipedia.org/wiki/Think_for_Yourself

http://www.mp3lyrics.org/t/the-beatles/think/

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Honorable Sidney H. Stein

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PETER W. LINDNER,

                    Plaintiff,

10 Civ. 2267 (SHS-AJP)

      -against-

MEMO OF LAW FOR PLAINTFF
CROSS-MOTION AND REPLY TO
AMEX RESPONSE ON ORDER TO
SHOW CAUSE

AMERICAN EXPRESS COMPANY

                   Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## Memo of Law

### My new Job

In order to put this in perspective, I note that due to Qing and Amex's actions, I have lost more than 1 job / career in my life. I think I was just given a job offer today, and don't want to ruin it by going to court and being late or absent for work. I thus ask the Court's indulgence since I may start April 5th, 2010 that such distractions could kill my new job, and I've been unemployed for about 7 ½ months in NYC, which to the uninitiated, is a long time to live **in Manhattan** without an income.

This case is about Amex's violation of my right to find and keep employment, and whether this action by Qing was an isolated incident or a part of string of incidents which have been covered up by payments to the injured party, or worse, by intimidation by Amex. By intimidation, I was asked by Ms. Jean Park in a deposition whether I "used meth", which is a remarkable term for a lawyer to use – usually only addicts use such terms. So, I asked Ms. Park for clarification, and she said methedrine. Her ostensible purpose in asking that question was to show that I imagined under a drug induced auditory hallucination that I only thought FischerJordan was offering me a full-time job if I worked hard for 1 month. And that I also imagined under said auditory hallucinations that Trevor Barran noted that Qing spoke to Boaz Salik at FischerJordan about me some months earlier, and also that auditory hallucination caused me to think of the two specific statements I wrote to Trevor that day describing what Trevor said, and somehow Trevor didn't catch that I was hallucinating since he replied that I had a good attitude. Well, enough of this sarcasm: Ms. Park's real purpose was to embarrass me, much like a rape victim would be asked if she ever had an abortion. Ms. Park's real purpose was to use any means possible, legal or illegal (if she could get away with it), to win the case for Amex and Kelley Drye & Warren LLP, and incidentally, for herself as a vain woman who is also a partner at Kelley Drye & Warren LLP. I'm not digressing. Amex and Kelley Drye & Warren LLP and now Skadden, Arps, Slate, Meagher & Flom LLP have conspired to deprive me and perhaps others of their civil rights and now also their Securities and Exchange Commission Shareholder rights. This is a serious charge, and that's why my Shareholder Proposal to look into systematic discrimination and cover-ups by Amex over the past 15 years is so important: you can't move ahead. Just like those pesky accusations in the Catholic Church keep coming up about boys being molested: it is getting so bad that when a priest has an affair with a woman, the comedians talk about it on TV as amazing that it was a heterosexual affair. I'm not saying the Church is a joke, or that it's a punchline; I'm saying that the Church has a serious problem that has gone on for years, despite a culture that deplores gay sex and deplores sex outside of marriage at all, and deplores sex with children, and deplores sex by its ostensibly celibate priests. The Church's problems are bigger than Amex, especially since Amex has no children and no rules about sex between consenting adults (single, married, adultery, etc.). But Amex does have rules about unwanted sexual approaches. (I was once attracted to a co-worker, and I carefully planned how I would ask him out, because I knew if he said "no," I could never ask him again.) It also has rules imposed upon it by the US Government

that forbid the use of power relationships in order to get sex: boss with employee, indications of quid pro quo on the workplace with sex. Supposedly, the Title VII of the Civil Rights Act of 1964 and Title VI which deals with Government contractors (which Amex is for both its card use in the US Government, military, etc) and by virtue of the $3.5billion that Amex took in TARP money to stay afloat in 2008 and paid back in 2009.

## The Sexual Harassment History

It started when Amex's Qing Lin sexually harassed me (defined as periodic, constant in my case, unwanted touching of my bicep) in 1998 and allegedly of others in my group, in this case by a manager to the people in his group. And when I reported it to Human Resources, it was met with denial and then me being fired, along with a different manager Daniel Almenara being promoted in return for firing me. They were part of the 7 people named in ¶13 of the June 2000 Amex-Lindner Contract (see Pacer Document 17 of Lindner v Amex & Qing Lin):

> "13. The Company agrees to instruct and direct the following Company employees not to disclose **any information** regarding Mr. Lindner's employment or termination of employment from the Company to any person outside of the Company and to direct all requests for references or inquiries received by such employees regarding Mr. Lindner to the appropriate human resources individual(s): Ash Gupta, Qing Lin, Daniel Almenara, Raymond Joabar, Wei Chen, Claudia Rose and Richard Tambor." [emphasis added]

Qing had allegedly also grabbed a guy who was muscular guy on his bicep, but that guy's response was to grab Qing's bicep and squeezing hard until Qing said "Oww, that hurts," and Qing never did that again. Although Qing did allegedly also once during a liquor fueled party at Amex follow the same guy into the men's room and take the urinal next to his instead the protocol of a urinal that was at the end surrounded by empty urinals, and then looked at this muscular colleagues penis while they both were peeing. "What's up, Qing?," my friend said, but Qing said nothing and kept staring at his penis. I consider this a breach of decorum, to say the least. My friend counseled me to ignore Qing, since Qing was our boss, but after talking to the Amex Ombudsman on how to deal with it, she counseled me to bring it up to HR. And when I was being reprimanded on my job, and literally being told how to do my job in a bad way (not use logistic regression and build a model to solve a problem, which my mentor Dan Massoni said incredulously to me "What, Almenara told you **not** to build a model?"), the female Ombudsman told me to keep mentioning it to higher up HR people. One day when she was not in, I was fired. I hired a lawyer for being fired.

After that, I applied for a job with Amex's competitor General Electric Credit Corporation where some people who used to work at Amex were now employed, and was scheduled for a job interview with GE, when the interview was cancelled. I was told that someone told GE I was "high maintenance." My lawyer Liz Schalet of Lipman & Plesur, LLP. said she did not want to take that part of the case, so I filed the case myself and I moved to sue Amex in NY State Small Claims Court. During the deposition of me by lawyers at Kelley Drye & Warren LLP, I was asked "Isn't it possible that saying you're 'high maintenance' is a positive comment? For instance, isn't a Jaguar automobile a 'high maintenance' car?" Ash Gupta who was Qing's boss was scheduled to be deposed by me, but Amex's lawyers resisted and told the Judge that he was too busy to come. The Judge asked, but surely Mr. Gupta can find some time since he is named Defendant?—words to that effect. So Ash was to be deposed by me at Kelley Drye & Warren LLP's office, and did not show up. I threatened the Amex lawyers that I would call the Judge and say "if this is not contempt of court, then I don't know what is." I suggested moreover that I would ask the Judge for a court marshal to escort Ash out of the Amex building and into the deposition. Amex asked me to settle. My lawyer – handling the main part of the case and not the GE retaliation part – said she would accept, and the details would be worked out in a few weeks. I told Liz my lawyer that if she accepted on such vague terms, I would immediately fire Lipman & Plesur, LLP. Amex added $20,000 to the offer to a total of $75,000. But Amex claimed it was a one-time offer and only in the next hour. A friend counseled over a pay-phone, while it was raining in NYC, that this was a bluff, since Amex would

have their offer on the table, but that is was about a year's salary, and this would put the matter behind me, especially since I was already working for IBM at the time, and this was taking me from work. I signed, and Ash escaped being escorted out of the Amex building by guards, or being cited for contempt of court.

Thus when Amex offered to close the secret deal, I insisted on a paragraph (¶13) that would ensure that Qing did not malign me to any employer and claim it was a "positive comment"—so Liz suggested we add the phrase "**any information**" as I highlighted above for emphasis. This was the paragraph that Qing violated in the spring of 2005, some 5 years after I, Amex and Ash Gupta, now the President of Banking at Amex, signed the secret June 2000 Amex-Lindner Contract. I could not reveal the amount of money and I could not even acknowledge the existence of the out-of-court settlement terms.

So, in the spring of 2005, after being laid off from IBM in August 2003, when I was being considered for a job with Boaz Salik and Trevor Barran at FischerJordan, a small consulting firm that worked with banks including American Express and MBNA, we had a good rapport. But they asked whom I worked for and with at Amex, and after I named many people (and I'm bad with names), I then also named Qing, whom they both immediately knew. FischerJordan said they'd get back to me with the hire yes/no decision in 3 days. I asked "3 days!?, that's really fast" and Boaz and Trevor said "Yup, that's the kind of firm we are." Some weeks and several emails later, Trevor wrote me that the position evaporated, but that he had a high regard for me, and I said vice versa. A few months later, Trevor contacted me to say they had a consulting gig in Wilmington, Delaware with MBNA, with transportation, hotel, and most important to me: meals, for a number of months on an exciting project accounting for Frequent Flier Miles. I agreed and started working as a consultant in June 2005.

Actually, the experience was a lot of fun. But during the first week, I would work until perhaps 11pm. At the Amtrak train station in Wilmington that Friday, waiting for the train to NYC, I told Trevor that I don't mind working to 10 or 11 pm if I'm getting paid by the hour as a consultant, but not working extra hours that are non-billable. I said, "Of course, if it's a full time job, then I don't mind working the extra hours, because I am a permanent employee instead of a consultant, and I'd be able to grow with the firm." Trevor said he'd give me a one month trial run, and if it was okay, he'd make me a full-time offer. I recall that vividly and even contemporaneously wrote a college friend of mine an email that talked about the long hours and the chance for full-time employment. Four weeks later (or 3 weeks since I had worked there for 1 week already), Trevor gave me my 1 month evaluation in the cafeteria of MBNA. He said that based upon what "Qing said a few months ago, he decided not to offer me full-time employment." I was incredulous and fuming, and feigned lack of knowledge, since the existence of the June 2000 Amex-Lindner Contract was secret. I gently pressed Trevor for what Qing said, and Trevor said that Qing told Boaz that I did not fit into the culture and that I did not have a strong ethic. I replied "If by 'ethic,' Qing means the 'Protestant Work Ethic,' then I surely do, and I can get a co-worker of mine at Amex who is a VP in charge of 20-40 people of Amex in Phoenix, AZ, who can tell you of my great work ethic. I was fuming, and called Liz, who said Qing's breach was not actionable, since she did not put any instructions in the Contract to penalize Amex if they breached it – just penalties for me. I called Amex to notify them of the breach, and Ash Gupta's secretary arranged a call during my lunch when I was in Delaware to Ash, I believe on Friday. When I called at the appointed time, the secretary refused to connect me to Ash, and security got on the line to talk to me. Ash was blocking my calls, and he enlisted the aid of his inferiors to have deniability.

I also wrote Ash, but spoke with Jason Brown, Esq. of the General Counsel's Office at Amex on or about July/August 2005, and he said he'd investigate those charges. He came back to me in a few days, and said "what you said was not correct." So, I asked what Qing had said, and Jason replied "I will not reveal the result of an internal Amex investigation."

In August 2005 I had an "episode" with my heart, that sent me to St. Vincent's Hospital in NYC. It turns out I was okay, but I was also anxious, since I was working with FischerJordan in Delaware, and that slowed me

down. Also: you don't get sick days or medical coverage when you're a consultant. A few weeks later, FischerJordan told me the job in Delaware was finished and they didn't need me for other jobs. I was told later that Trevor underestimated the amount of cleanup at MBNA, and had to do a lot of work by himself, while the other co-worker went back to college / grad school.

I started a new consulting job in Long Island that took a long commute, and talked to Secretary of the Corporation Stephen Norman about his role in handling the Amex Code of Conduct, which clearly Qing had violated not only by breaching the June 2000 Amex-Lindner Contract, but also by not asking his boss, Ash, whether Qing should talk to FischerJordan about me (since he hates me for outing him at work) or whether Qing should not say anything and refer FischerJordan to HR; the June 2000 Amex-Lindner Contract said he was to be instructed and directed to not give any information and to refer FischerJordan to HR.

> "[¶13.] The Company agrees to instruct and direct the following Company employees not to disclose any information regarding Mr. Lindner's employment or termination of employment from the Company to any person outside of the Company and to direct all requests for references or inquiries received by such employees regarding Mr. Lindner to" HR.

Mr. Norman agreed to do an investigation, but unfortunately he picked Jason Brown again to re-investigate it. I disagreed with his choice, but perhaps it would work. I also spoke to Boaz Salik at FischerJordan and asked him if he would make a statement, and he refused. I said: "What if you could talk to someone high up in Amex, and they could protect you from any consequences, would you be completely open with them?, for example, Secretary of the Corporation Stephen Norman." Boaz said yes. Unfortunately, Mr. Norman said "no," and that Jason would speak to Boaz. I asked Jason to please indicate to Boaz that his investigation was directly for Mr. Norman who would protect him. This did not work out well.


## Lindner informs Ash Gupta by certified mail

On February 10, 2006, I moved to inform Ash Gupta, now the President of Banking at Amex, that his protégé Qing was being investigated a second time by Jason Brown, Esq., this time under the direct authorization of Secretary of the Corporation Stephen Norman, Esq.

> "Now you are being investigated also. And you can mitigate your punishment / consequences by investigating this matter, including demanding to know from your people (does Qing report to you, directly or indirectly?) what did Qing know, and when did he know it. If you determine that Qing did indeed speak to Boaz Salik of Fischer Jordan in April / May 2005 about me – which led to me not being offered a full time job at FJ – then you should remind Qing that it violates a document you signed, and that you should affirmatively report this investigation to Mr. Norman's office. According to the "Code of Conduct"[7], you will be given more lenient treatment if you volunteer information and proactively stop violations of the code than if you wait for those charges to be proven against you.

> Prosecutors in federal cases against Labor Union officials in the 1960's-1970's used a metaphor of a boat leaving the dock. They urged the people to get on the boat before it departs, or else they will be stuck. The boat was an impending point in the case where cooperating witnesses would get partial immunity. Those left at the dock would get a more harsh treatment.
> I am sending this to you by certified mail, return receipt requested, so that you cannot say you did not know that Qing told Boaz, and that Boaz told Trevor Barran, and that Trevor told me, and that I

---

[7] "The fact that you have reported the violation will be given consideration in determining appropriate disciplinary action, if any. In many cases, a prompt report of a violation can substantially reduce the adverse consequences of a violation for all involved — third parties, the Company and you."

confirmed this with Trevor via email in July 2005, and confirmed it with Boaz face-to-face and via email in July/August 2005.  It is somewhat weak to just say it did not happen.  And, you should like to know, there may well be other testimony from another firm that would implicate Qing.  Ash, the matter was closed in June 2000, and Qing chose to open it five years later, perhaps with your knowledge, perhaps without it.  "

On February 28, 2006, I met with Jason Brown, who told me in person at Amex Headquarters 200 Vesey Street, that Qing said to FischerJordan "I don't think Peter Lindner can work here."  I iterated that to Mr. Brown, and sent him an email confirming that, and that clearly Qing breached the June 2000 Amex-Lindner Contract.  Success!  But, then not, since Jason denied it.

I had written him:

| "Peter Lindner" | | |
|---|---|---|
| <nyc10003@nyc.rr.com> | To: | Jason K Brown/AMER/CORP/AEXP@AMEX |
| | cc: | "LAWRENCE ANGELO" <LAWRENCE.ANGELO@EEOC.GOV> |
| 03/01/06 01:02 AM | Subject: | Summary of our face-to-face meeting at Amex on Tue Feb 28 2006, with your admissions of statements by Qing |

Tuesday, February 28, 2006

Jason:

This memo summarizes our conversation today from 6-7pm at the Amex HQ in NYC. For the record, you had a physically imposing guard (I don't know if he was armed or not) asking to stay in the room while we talked, but you told him that he could wait outside.  I'm sorry that you feel that I am violent.  I am not.  But I am determined.  So let me

- summarize our talk and
- point out how Qing admitted to you (an officer of the court) of him violating the Amex Lindner Agreement of June 2000, and
- suggest what you should do next to conclude this matter.

I appreciate that you told me that during your investigation so far that Qing Lin admitted to talking about me to Boaz Salik.  Specifically, you said that Qing told you that when Boaz mentioned to Qing that Boaz was thinking of hiring me, that Qing said "I don't think he can work here."

I then went on to point out the implications of that in a 5-page letter:

Well, it's not what Boaz told me about that conversation. and I hope you take Boaz up on his offer to sign a notarized statement about what the entire conversation with Qing was. As you recall. Boaz (principal in Fischer Jordan "FJ") said he might give a notarized statement if the Amex Corporate Secretary asked Boaz for that statement. And as you recall in my email[i] to you. Amex Corporate Secretary Stephen P. Norman. and Boaz (cc: Trevor Barran, who is Boaz's partner in FJ). I told Boaz that Mr. Norman specifically delegated the task of investigation to you Jason, and that the request of Mr. Norman would therefore come through you.

By the way. what Qing said about me may be literally true: Qing may not think that I "can work at Amex". Of course. I can work at Amex if you get acquired by another company[ii]. since I specifically asked your lawyers to add that provision in case you get bought out – after all the credit card world is small and there are mergers all the time and NYC is even smaller still. But also. I can work at Amex if I am an employee of another company: e.g. if I worked at IBM and repaired your computers or if I were a janitor for a vendor of yours and mopped your floors. If FJ was not part of your company back in June2000 and is not part of Amex when I join FJ. then I would not be violating the agreement. Of course, Qing might not "think" that that is true.

But in any case. it's good to hear that Qing has modified his story and now admits that he violated the spirit and I feel the letter of the Amex-Lindner Agreement of June 2000 paragraph 13 when he made any comment about me. instead of telling Boaz to speak to HR[iii].

Thus. as you stated to me.

- Qing violated an instruction of the American Express Company
- which was a written instruction and
- which he was aware of and
- which he could have availed himself of The Corporate Secretary's wisdom on what course of action to take.
- Qing decided to ignore that instruction.
- Qing decided to not inform his manager.
- Qing decided not to seek advice from The Corporate Secretary
- even though he signed the Amex Code of Conduct saying that he would follow it and
- even though Qing was aware that Boaz was enquiring as to Peter seeking employment at FJ (and not as an Amex employee by as a FJ employee)

And he replied in full

"Rather than respond point by point to your email, I write to inform you that I do not agree with much of what is raised below including, but not limited to, your memorialization of our conversation.

I will call you after I have spoken to Boaz."

| From: | Jason K Brown [jason.k.brown@aexp.com] |
| Sent: | Wednesday, March 01, 2006 7:08 PM |
| To: | Peter Lindner |
| Cc: | LAWRENCE ANGELO |
| Subject: | Re: Summary of our face-to-face meeting at Amex on Tue Feb 28 2006, with your admissions of statements by Qing |

Mr. Lindner,

Rather than respond point by point to your email, I write to inform you that I do not agree with much of what is raised below including, but not limited to, your memorialization of our conversation.

I will call you after I have spoken to Boaz.
Thanks,
Jason

Jason K. Brown
Vice President and Group Counsel
American Express Company
General Counsel's Office
200 Vesey Street, 49th Floor, UMC NY 01-49-10
New York, NY 10285
Tel: (212) 640-4807
Fax: (212) 640-0388

Fast forward to my lawsuit commencing, Amex refusing to supply emails (even though required by law: FRCP 26, as revised December·2006 by the US Supreme Court ), and refused to allow either Stephen Norman or Ash Gupta to be deposed – ostensibly since Mr. Norman was not involved in the breach and "Mr. Gupta similarly." I believe that was one of the early intents to deceive of Ms. Park, since Mr. Gupta was specifically named in the June 2000 Amex-Lindner Contract several times, and Mr. Gupta signed that breached document, and Mr. Gupta turned out to be the person who instructed and directed Qing not to give "any information" to FischerJordan.

But, in January 2009 after 4 years of waiting to confront Qing, I acted as my own lawyer to depose Qing, who admitted under oath that he gave "any information" to FischerJordan, and specifically he spelled out whom: "B-O-A-Z- S-A-L-I-K" and that Qing did not refer Boaz to HR.  And the next week, Jason confirmed that Qing told him in February 2006 that Qing told FischerJordan that "I don't think Peter Lindner can work at American Express", which Jason had jotted down on a sheet of paper using the NY stock exchange symbol AXP for the word American Express.  Jason also said he had a folder called the Lindner file that he had not turned over, but Amex successfully fought to keep that confidential under lawyer client privilege, as it did for many documents and other requests, even though the law (to me as a layman) is quite clear:  a list (log) of all privileged documents must be listed, and detailed what is confidential, without disclosing its contents.  Amex did not produce a privilege log, and the Court sustained Amex's alleged violation of discovery.

> **"Privilege log contents**
>
> Several recent cases have addressed what must be included in a privilege log. The basic rule is given in FRCP 26(b)(5):
>
> > the party [asserting privilege] shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection. "
>
> [Law Practice Today, "The Attorney-Client Privilege and the Amended Federal Discovery Rules,", by Carl G. Roberts, December 2006, American Bar Association]
> http://www.abanet.org/lpm/lpt/articles/mgt12062.shtml

Now, it would have been nice if I could get my DVD made by a videographer at great expense in addition to what I paid for a court reporter.  The Southern District of New York has facilities for an audio recording, but I wanted the dramatic impact of someone admitting on TV that they violated a contract and perhaps a law.  But Amex moved to have Magistrate Judge Katz keep the DVDs and the audio tapes under the guise that there is no need for them, and that if a trial were held, the person could appear and the DVDs would be ignored – or possibly only then be used to impeach the witness' credibility.  In fact, Ms. Park mentioned YouTube.com specifically.

## <u>The Tempermentals</u>

This has been a destructive time in my life, but it's noteworthy that gay people have had it worse some 50 years ago.  I also could relate to it since as the second in the play, one of the organizers of the first gay group in the USA was a Jew who was gay, but unlike me, he married a woman, decided to stay in the closet until his death, and became a success.  We Americans should learn from this historical play that Americans should not tyrannize and criminalize people for their characteristics, whether chosen or born into (e.g. religion or race). Sadly, some 50 years later, people remain in the closet, and worse, prey upon others.  What may be unacceptable when done to a woman nowadays, is acceptable when done to a man.  In other words, if Qing had sexually harassed a woman, and then years later  retaliated against her, I feel American Express would have punished him; but since Qing's transgression was done to a gay, well that's okay since NHI – no humans

involved in this incident.  And even if there's a victory, Amex will conspire to make it unknown, as in the play, so that gays are kept down in their place.  I feel very strongly this is a matter of discrimination against gays, and sex discrimination, and of retaliation.

> "Gay activism didn't start with the Stonewall riots of 1969, a fact made abundantly clear in the informative and evocative play "The Temperamentals" by Jon Marans ("Old Wicked Songs").
>
> In 1950 Harry Hay (Thomas Jay Ryan), a teacher and Communist Party member, helped form a group, later called the Mattachine Society, devoted to the welfare and protection of "temperamentals" (Hay's term for gay men). His principal collaborator was his lover at the time, Rudi Gernreich (Michael Urie), a Hollywood costume designer and Viennese Jew who had escaped the Holocaust and who, years later, would become famous as the creator of the topless bathing suit.
>
> …Sam Breslin Wright as Dale Jennings, a former policeman who risked imprisonment by admitting his homosexuality in court.
> …Nevertheless, "The Temperamentals" succeeds at conveying an era when only a few brave men dared announce their sexual identity before a society that vilified them."
> ["Coming Out of the Closet and Onto the Streets," NY Times, By Andy Webster, Published: May 9, 2009]
> http://www.nytimes.com/2009/05/09/theater/reviews/09temp.html?_r=1&hpw

Another reviewer points out that the court victory is muted, when the press decides not to cover the matter:

> "All this amounts to little until a man named Dale Jennings (played by Sam Breslin Wright), a former cop himself who has become a carnival worker, is entrapped by a police officer in a men's room, although we are made to understand that Jennings is actually innocent; the police officer wrote down "N.H.I." in his report, which was viciously sardonic police code at the time for "No Humans Involved." Rather than do what everybody had always done, pay the $300 to $3,000 fine, with the support of the Mattachine members, Jennings decides to fight the charge in court. The strategy is to tell the truth both about his innocence and his homosexuality, an admission that would endanger future employment, housing, you name it. Eleven members of the jury side with him, a hung jury, the prosecutor declines to try the case again, but **this is seen in 1952 as an unmitigated and unprecedented victory — although not a single newspaper writes about it, and even their own lawyer would not accompany them to a coffee shop in celebration.**"
> [Mad Men Meets Milk: The Temperamentals Review, February 28, 2010 Jonathan Mandell,  (emphasis added)]
> http://thefastertimes.com/newyorktheater/2010/02/28/the-temperamentals-review/

## NY Judiciary Law §487

In  *Amalfitano v. Rosenberg* 06-2364-cv, the US Court of Appeals for the Second Circuit ruled in the affirmative that "(1) Can a successful lawsuit for treble damages brought under N.Y. Jud. Law § 487 be based on an attempted but unsuccessful deceit upon a court by the defendant?"  In other words, I assert that both Ms. Park and Ms. Sacca attempted to deceive the Court in NY State on the basis of whether Amex had never tried before 2009 to stop me from communicating with the SEC, even though Amex did in April 2007.

7          On July 15, 2008, we certified two questions to the New

8    York State Court of Appeals:

9              (1) Can a successful lawsuit for treble
10             damages brought under N.Y. Jud. Law § 487 be
11             based on an attempted but unsuccessful deceit
12             upon a court by the defendant?

13             (2) In the course of such a lawsuit, may the
14             costs of defending litigation instituted by a
15             complaint containing a material
16             misrepresentation of fact be treated as the
17             proximate result of the misrepresentation if
18             the court upon which the deceit was attempted
19             at no time acted on the belief that the
20             misrepresentation was true?

21   Amalfitano v. Rosenberg, 533 F.3d 117, 126 (2d Cir. 2008).  We

22   noted that we "would almost surely affirm the district court's

23   judgment in its entirety if the New York Court of Appeals

24   determines that section 487 permits the award of treble damages

25   for an attempted deceit of the New York courts."  Id.  The Court

26   of Appeals has now answered both certified questions in the

27   affirmative, see Amalfitano v. Rosenberg, 12 N.Y.3d 8, 903 N.E.2d

28   265, 874 N.Y.S.2d 868 (2009), and, in light of that decision, we

29   do indeed affirm.

**RICO Statute**

"So long as a civil RICO plaintiff is injured by reason of the defendant's operation or management of the enterprise through a pattern of racketeering, the plaintiff is entitled to treble damages, attorneys' fees and costs under section 1964(c) (commonly referred to as RICO's civil liability provision)."[8]

I assert that several persons collaborated in a conspiracy to deprive me of my civil rights under Title VII of the Civil Rights Act of 1964, and in a breach of contract (the June 2000 Amex-Lindner Contract), and in my Shareholder rights to present a Shareholder Proposal in 2007, 2008, 2009, and now 2010. The persons include:

- Jean Park, Esq. of Kelley Drye & Warren LLP, who stopped me from going to the SEC in 2007, and then filed a brief with the Southern District of New York asserting that I was not stopped by Amex in communication to the SEC, and then kept silent while her co-counsel made denials to USDJ Koeltl on that in April 2009.
- Joe Sacca Esq. of Skadden, Arps, Slate, Meagher & Flom LLP, who wrongly told the Court about Amex not stopping my communicating with the SEC prior to 2009, was verbally corrected by me in Court
- CEO Ken Chenault, Esq.
- Secretary of the Corporation Carol Schwartz, Esq.

As to being able to get the information to file correctly with the SEC, Amex refused for several months to give me the transcript of CEO Chenault's April 2009 remarks, and I could not obtain the video. What I wanted to do is include his remarks along with the actual quotes from Qing and from Jason Brown, Esq. which contradict what Mr. Chenault, Esq. said. It would be more powerful as a video, whom I have had discussion with about crafting one that would appear on an SEC approved site and/or be shown on YouTube so that employees can see that Ken Chenault was wrong, and that Qing lied for 4 years about breaching the document signed by his boss Ash Gupta, now the President of Banking at Amex, and that they had neither integrity nor values to have confidence in, and that the Code of Conduct was not working.

By not giving me the documents I needed in a timely fashion, and then saying I was late, it is analogous to the US Court of Appeals for the Second Circuit decision on RICO that used the analogy of a sponge left in a patient who later got sick.[9] *Bankers' Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988) If I cannot discover what CEO

---

[8] On the web as "Rico in a Nutshell -- Section 1962(c) Claims"
http://www.ricoact.com/ricoact/nutshell.asp

[9] It is told better than I can retell it:

1. *"Early Conflicting Accrual Rules*

The United States Courts of Appeals adopted three different accrual rules. The United States Court of Appeals for the Second Circuit was the first to consider the issue in *Bankers' Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007 (1989). In *Bankers' Trust*, the Second Circuit analogized RICO claims to medical malpractice claims that may give rise to latent injuries. For example, a physician may negligently leave a sponge in a patient during surgery, the sponge may not give rise to problems until years later when it becomes the source of an infection that otherwise would not have occurred. Under these circumstances, one cannot possibly charge the patient with an obligation to bring his malpractice claim before he had any reason to believe that malpractice occurred, i.e., before the forgotten sponge caused an infection. Likewise, in the RICO context, an employee may be taking bribes from a vendor and in exchange the employee may buy products (on behalf of his employer) from the vendor at inflated prices. The employer may not discover this bribe scheme until the employee's personal taxes are audited by the IRS and the bribe payments are discovered and reported by the IRS to the employer. If the employer could not reasonably have discovered the inflated prices before the IRS audit, then he cannot be charged with an obligation to bring a RICO claim at an earlier date. In essence, the common law generally postpones the running of the statute of limitations until the plaintiff knew or reasonably should have known of its injury.

Chenault said, nor can I contact Amex without fear of getting cited by Ms. Park to Magistrate Judge Katz for contempt of court, then I cannot be found negligent for filing late. So, "the common law generally postpones" deadlines "until the plaintiff knew or reasonably should have known of its injury." I would gather that many employees are not even aware that the Shareholder Proposal would benefit them, that their shares can be voted, and that Amex's Secretary of the Corporation Carol Schwartz, Esq. is voting against the employees' interests.

> "Even more troubling was the prospect that, like the plaintiff's injury, a pattern of racketeering activity could be concealed from the plaintiff, and without knowledge of the pattern of racketeering activity, the plaintiff could not file suit even if it was aware of its injury."
> [Ibid.]

Let's start with Ms. Park. I said to the Court on April 14, 2009 that Amex stopped me from exercising my Shareholder rights by asking me to "withdraw" my filed SEC preliminary PREC 14A, and then stopping me from filing additional documents to the SEC:

```
12          MR. LINDNER:  Thank you, your Honor.  I wanted to
13   address that Amex has consistently tried to stop me from
14   exercising my shareholder rights.  I have tried on a timely
```
[94E4LINC, TR 3, lines 16-19, before USDJ Koeltl]

and that Amex censored the documents I needed to submit to the SEC:

```
19          even in communicating with the Securities and Exchange
20   Commission, upon their saying that there are defects in my
21   proposal, that I cannot provide a factual basis.
```
[Ibid, TR 2, Lines 19-21]

 Then Ms. Park denied that and that Amex did in any way restrain or delay my "Shareholder activities", despite that Amex did so in April 2007

```
16          I want to make clear, your Honor, that at no juncture
17   has the company in any way restrained, obstructed, or in any
18   way attempted to delay or frustrate Mr. Lindner's shareholder
19   activities.  The only thing we have sought, your Honor, from
```
[Ibid., TR 5, lines 16-19, before USDJ Koeltl]


Later on that day, Mr. Sacca adds wrongly that my Shareholder proposal was "ordinary business operations" when the SEC's rules on Shareholder Proposals specifically mention that discrimination and significant social matters are not "ordinary business". Here's Mr. Sacca's quote on that, which shows Mr. Sacca knowingly intended to deceive The Court on this issue:

---

The Second Circuit saw no reason to depart from this common law rule in the context of a RICO claim and, accordingly, adopted the common law "discovery of injury" rule as the accrual standard for a RICO claim. "
http://www.ricoact.com/ricoact/nutshell.asp#accrual

```
 7    for a third time.  On December 17, 2008, the company again gave
 8    notice to the SEC of its intent to exclude the proposal, again
 9    laying out the reasons, including that the proposal dealt with
10    American Express's ordinary business operations.
```
[Ibid., TR 11, lines 7-10]

And to emphasize, Mr. Sacca goes on to say "Amex **never sought** ... an order from Magistrate Judge Katz or any other forum saying Mr. Lindner could not communicate with the SEC." (emphasis added)

```
13    materials and he did not.  Just to be clear, American Express
14    never sought nor did it ever receive an order from Magistrate
15    Katz or any other forum saying Mr. Lindner could not
16    communicate with the SEC.
```
[Ibid., TR 12, lines 11-16]

For the record, Amex did just that: Jean Park sought and did receive an order from Magistrate Judge Katz, sustained by USDJ Koeltl that sealed the evidence of Ms. Park requesting the sealing of those documents, even while expressing His Honor's surprise at the "urgency" of sealing these documents:

April 6, 2007

ican Express Corporation
06-03834 (JGK-THK)

's order concerning plaintiff's objections to Defendants'
[Pacer document Number 26 April 6 2007, 06cv3834]

Later, His Honor USDJ Koeltl notes that Defendants Amex and Qing Lin seek to "enforce an alleged settlement agreement ... because it contained confidential information."  The alleged oral agreement which USDJ Koeltl later found to be non-existent as an agreement had the clause that I withdraw my "proxy filing" with the SEC

    **The settlement should be enforced in all respects, affirmatively requiring plaintiff**

**to withdraw his proxy filing and to cease and desist from other conduct in violation of the**

**parties' settlement terms, and dismissing the complaint.**

[p.11 of 13 , Number 36 April 17 2007 Jean Park ask for protective order .pdf]

    JOHN G. KOELTL, District Judge:

     The defendant seeks to make a motion to enforce an alleged

settlement agreement.  The defendant sought, with the purported

consent of the plaintiff's counsel, to file the motion under seal

because it contained confidential information, an application that

the Court granted.  By facsimile dated April 6, 2007, the plaintiff

pro se now objects to the conduct of his attorney and raises the

question of what documents are required to be sealed.

    [Pacer #27, April 6, 2007]

I hint at the back and forth, but I laid it all out for Mr. Sacca to see that he indeed misspoke when he told The Honorable USDJ Koeltl that Amex never tried to interfere with me communicating to the SEC.

I include that in my filing as  (sorry for the flip language) "Joe --Are you weaseling out of this.pdf", which I sent Mr. Joe Sacca via email Tue 3/16/2010 6:17 PM.  It is Exhibit 1.

## Lehman Brothers – illegal acts?

In these two reports, the actions of Lehman Brothers are termed illegal by "underreporting its debt by about $5 billion at the end of each month."[10]  In other words, each month Lehman Brothers moved money off of its books to look better.  And that "Richard S. Fuld Jr., Lehman's former chief executive, certified the misleading accounts, the report said. ... Mr. Fuld was "at least grossly negligent.""[11]

So, basically, fancy footwork was used, and the company hid its actions from its owners and its regulators.  I believe the actions of American Express Executives, including Secretary of the Corporation Carol Schwartz,

---

[10] The quote is:

"In a letter dated May 18, 2008, Lee wrote that he discovered that the bank had been underreporting its debt by about $5 billion at the end of each month. Lee, a 14-year Lehman veteran, wrote that he felt compelled to report the "discrepancies" under the firm's code of ethics, saying he believed they "possibly constitute unethical or unlawful conduct."

"I believe the manner in which the firm is reporting these assets is potentially misleading to the public and various governmental agencies," Lee wrote. "If so, I believe the firm may be in violation of the code."

Days after sending the letter, the firm told Lee he was being terminated as part of a general layoff, Shustak said. After his firing, Shustak wrote a letter to the bank saying that Lee "believes he has been the victim of retaliation for bringing what he believed, in good faith, to have been ethical and securities law violations by Lehman.""
["Letter: Lehman accounting tricks possibly illegal", By Stevenson Jacobs, AP Business Writer, AP Business Writer – Sat Mar 20, 2010 2:35 am ET]
http://news.yahoo.com/s/ap/20100320/ap_on_bi_ge/us_lehman_brothers_whistleblower

[11] The quote is, and from a slightly more reliable source: The NY Times, Andrew Ross Sorkin, and the Court Appointed Examiner who uncovered that "Repo 105" was used to hide assets, but it's "not clear that there was a crime committed in the fall of Lehman Brothers"

"It's not clear that there was a crime committed in the fall of Lehman Brothers. But the court-appointed examiner's report makes it clear that there was financial massaging going on.

The examiner, Anton R. Valukas, refers repeatedly to "Repo 105," a name for a set of accounting tactics originated by Lehman that temporarily shuffled about $50 billion off the firm's balance sheet for the two fiscal quarters before it collapsed."
http://dealbook.blogs.nytimes.com/2010/03/11/lehman-directors-did-not-breach-duties-examiner-finds/#reports

"It is the Wall Street equivalent of a coroner's report — a 2,200-page document that lays out, in new and startling detail, how Lehman Brothers used accounting sleight of hand to conceal the bad investments that led to its undoing. ...
According to the report, Lehman used what amounted to financial engineering to temporarily shuffle $50 billion of assets off its books in the months before its collapse in September 2008 to conceal its dependence on leverage, or borrowed money. ...
Richard S. Fuld Jr., Lehman's former chief executive, certified the misleading accounts, the report said.
... Mr. Fuld was "at least grossly negligent," the report states ...
Lehman executives engaged in what the report characterized as "actionable balance sheet manipulation," and "nonculpable errors of business judgment."
The report draws no conclusions as to whether Lehman executives violated securities laws. But it does suggest that enough evidence exists for potential civil claims. Lehman executives are already defendants in civil suits, but have not been charged with any criminal wrongdoing. "
["Report Details How Lehman Hid Its Woes," By Michael J. de la Merced and Andrew Ross Sorkin,
Published: March 11, 2010]
http://www.nytimes.com/2010/03/12/business/12lehman.html?scp=2&sq=lehman%20brothers&st=cse

Esq., and CEO Ken Chenault, Esq., along with Joe Sacca, Esq. and Jean Park, Esq. did conspire to deprive their employees of the right to vote their shares, while simultaneously voting against those interests of this bloc of Shareholders.

Specifically, had my Proposal been on the proxy, then in accordance with the revised rules mentioned by Amex in their Mar, 2, 2010 filing with the SEC, the banks could not vote the shares.  However, last year Amex voted those shares against my proposal, and Amex also noted that "the named proxies … intend to **exercise such discretion** to vote "AGAINST" … the Lindner Proposal," [emphasis added].  Now, American Express became a bank about two years ago in order to get TARP money, and banks can **not** as "in the past, … have discretion to vote uninstructed shares on the shareholder proposals (Items 4, 5 and 6 of this proxy statement)."  My Shareholder Proposal would have been Item 7.  Thus, and I'm not a lawyer nor a Securities and Exchange Commission expert, Amex is voting the shares of its employees against my proposal, which if it were on the ballot, Amex would then be in the same group as the "bank and brokerage accounts"  and Amex "will not have discretion to vote uninstructed shares on the shareholder proposals".  A little confusing, but I suggest, like the Poll Tax and cleaning voter rolls before an election of members of the opposite party, Amex is creating a legal way to diminish knowledge, and then participation, and then possible abuse of fiduciary responsibility by voting the employee shares against the employees's interests (**both** current and former employees).

Not to go overboard, but CEO Ken Chenault chooses Secretary of the Corporation Carol Schwartz, Esq. to be the proxy, and she then announces she will vote against my Shareholder Proposal regardless of the wishes of her employees, rules that my Shareholder Proposal is invalid but can be presented at the meeting where she can vote against it.  Yet even banks cannot vote as they would think their clients would have wanted to vote, yet Ms. Schwartz can not only vote those shares, but also the "discretion to vote uninstructed shares on the shareholder proposals" against what those people would have wanted.  That, in my mind, is a breach of fiduciary responsibility.  And a perversion of justice.  And a disenfranchisement of a bloc of Shareholders who are or were employees, or families of such employees, including some who were subjected to adverse treatment by Amex on employment discrimination.  And a violation of the principles of the SEC in allowing votes on socially significant issues, such as discrimination.  And a violation of keeping the interests of the owners (the Shareholders) supreme against the wishes of management.  Thus, if 50 million shares (for instance) were for employees, those 50 million Shareholders would not find out about my proposal, nor could they vote for it unless they were physically present at the meeting, nor could they vote for it the weekend before the meeting (I believe voting stops 11:59pm on Friday before the Monday meeting).  And worse: instead of being 850million against my proposal to 3,000 for it, it would be 900million against my proposal.  I will freely admit that I do not have the number of shares owned by Amex employees.  However, I am attempting to find out by using the estimate from the size of the Amex Share pool, administered by Wells Fargo. [**Call WF to get $ in employee share fund**]

> "The Board of Directors and the Company's management have not received notice of, and are not aware of, any business to come before the Meeting other than the agenda items referred to in this proxy statement and the possible submission of the Lindner Proposal which, while not included in this proxy statement, may be presented by Mr. Lindner at the Meeting. In such event, **the named proxies will have discretionary voting authority under Rule 14a-4(c) of the Exchange Act with respect to the Lindner Proposal and intend to exercise such discretion to vote "AGAINST" such proposal** if presented at the Meeting. Adoption of the Lindner Proposal, like the other shareholder proposals that are on the Company's agenda at the Meeting, requires the approval of the majority of the votes cast. Abstentions and broker non-votes are not considered as votes cast and will have no effect on the outcome of the vote on the Lindner Proposal. If any other matter comes before the Meeting, the named proxies will use their best judgment in voting the proxies."
> [page 61, Amex Preliminary Proxy of Mar 2 2010 PREC14A, /s/Carol V. Schwartz, Secretary & Corporate Governance Officer, emphasis added]

"The Board has appointed Daniel T. Henry, Louise M. Parent and **Carol V. Schwartz as proxies** who will vote your shares on your behalf."
[Ibid, p. 15, emphasis added]

"If you hold your shares in street name in a bank or brokerage account, it is critical that you cast your vote if you want it to count in the election of Directors (Item 1 of this proxy statement). **In the past**, if you held your shares in street name and you did not indicate how you wanted your shares voted in the election of Directors, **your bank or broker was allowed to vote those shares on your behalf in the election of Directors as they felt appropriate.** Recent changes in regulation take away the ability of your bank or broker to vote your uninstructed shares in the election of Directors on a discretionary basis. **Thus, if you hold your shares in street name and you do not instruct your bank or broker how to vote in the election of Directors, no votes will be cast on your behalf.** Your bank or broker will, however, continue to have discretion to vote any uninstructed shares on the ratification of the appointment of the Company's independent registered public accounting firm (Item 2 of this proxy statement) and on the advisory vote on executive compensation (Item 3 of this proxy statement). As in the past, they will not have discretion to vote uninstructed shares on the shareholder proposals (Items 4, 5 and 6 of this proxy statement)."
[Ibid, p. 3. emphasis added]

## Amex has intended to deceive the Court

I assert that Amex has repeatedly deceived this honorable Court by falsely claiming my Shareholder Proposal was "ordinary business", when it wasn't and Amex knew it, and that Amex falsely claimed they had not interfered with me communicating to the SEC. These are serious crimes both in terms of lawyers' ethics, the law in NY State, the Securities and Exchange Commission rules, and in terms of American decency.  Amex shouldn't have won in the past in reward for its misconduct, and should not do so now.  I am not perfect, and my briefs may have holes in them  (pun intended on two levels), but Amex should not get away with it again, and as Jimmy Kimmel said to Jay Leno: "Oh, this is a trick, right? Where you get me to host 'The Tonight Show,' and then take it back from me? Listen, Lucy, I'm not Charlie Brown. I don't fall for that trick"  Amex had offered me the Shareholder mailing list for $5,000 one year, but said it would be on paper.  Amex said I could mail to their Shareholders, but it was to a subset of the entire Shareholders.  Amex said I could present the Proposal at the April 2010 meeting, but have effectively stopped their Shareholders from knowing about the matter or even voting on it at the meeting since voting over the web is closed days before the meeting.

I hope that Your Honor will not fall for Amex's trick this year, as both the SEC and the Southern District of New York have in the past.

Here's the Jimmy Kimmel quote:

> "Jay Leno doesn't appear to have any allies left among his late-night colleagues. On Thursday night, ABC's Jimmy Kimmel used an appearance on "The Jay Leno Show" to rip the host, who good-naturedly put up with the sharp-edged ribbing.
>
> When Leno asked Kimmel what show he would still like to host, the ABC comedian responded: "Oh, this is a trick, right? Where you get me to host 'The Tonight Show,' and then take it back from me? Listen, Lucy, I'm not Charlie Brown. I don't fall for that trick."
>
> A few minutes later, when Leno suggested he might make the jump to ABC, Kimmel stuck the knife in deeper: "Listen, Jay, Conan and I have children....You've got $800 million. For God's sake, leave our shows alone!"

Matea Gold"
["Jimmy Kimmel goes after Jay Leno during Leno appearance," January 15, 2010 ,  8:47 am"]
http://latimesblogs.latimes.com/showtracker/2010/01/jay-leno-jimmy-kimmel-appears-on-the-jay-leno-show.html

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    Honorable Sidney H. Stein
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PETER W. LINDNER,                                10 Civ. 2267 (SHS-AJP)
                          Plaintiff,

              -against-                           AFFIDAVIT OF PLAINTFF CROSS-
                                                 MOTION AND REPLY TO AMEX
                                                 RESPONSE ON ORDER TO SHOW
AMERICAN EXPRESS COMPANY                          CAUSE
                          Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Affidavit**

STATE OF NEW YORK       )
                        :        SS.:
COUNTY OF NEW YORK  )

       PETER LINDNER, being duly sworn, says:

1. I am the Plaintiff in this action.

2. I make this affidavit on personal knowledge on a reply and cross-motion to Defendants  American
   Express, and their officers, and their counselors.

3. When I tried to vote my shares of American Express stock in 2007, the Ameriprise and other custodians
   did not know if I could vote them, or how to do so.

4. I had respectfully asked Ms. Park for the third time on May 1, 2009 for the DVD and Transcript of the
   April 2009 Shareholder meeting, which was allegedly passed on to Amex, although Ms. Park was
   initially quite brusque and wrote me **in full**:

   > From: "Park, Jean Y." <JPark@KelleyDrye.com>
   > To: <nyc10003@nyc.rr.com>
   > Sent: Friday, May 01, 2009 4:49 PM
   > Subject: RE: 3rd request for Amex S/H Meeting of April 2009, with not even a
   > courtesy of a reply. Nor on Objection to USDJ Koeltl of MJ Katz ruling
   >
   > Magistrate Judge Katz has never issued an order precluding you from
   > accessing publicly available documents.  Get it yourself.

5. Yet Amex did not ever give me the DVD and only gave me the transcript some ten months later (see
   below).

6. Ms. Park informed my lawyer only on Fri 3/5/2010 4:56 PM that I could get the CEO transcript of April
   2009 from the website, yet with all my computer ability (which is sizeable), I was not able to do so.  The
   email which also contained the transcript said:

   > On another, but related note, attached is a transcript of American Express' April 27, 2009 shareholder
   > meeting.  I understand that Lindner has been demanding this transcript despite the fact that a recording of
   > this entire meeting can be accessed and listened to on the Company's website.  So, here it is.
   >
   > Jean

7. Thus I asked for the transcript and DVD of the April 27, 2009 Shareholder meeting on May 1, 2009 and got only the transcript on March 5, 2010, some 308 days later, or over 10 months.

8. I recorded videos of Qing Lin describing in January 2009 under oath the spelling of Boaz Salik (Principal of FischerJordan consulting firm, where I applied for a job) whom Qing gave "any information" about me in violation of ¶ 13 of the June 2000 Amex-Lindner Contract ("¶13"), but Ms. Park got Magistrate Judge Katz to confiscate the DVDs so that I could not use them on the web.  Please note that all Securities and Exchange Commission filings are on the web, as was the actual Shareholder meeting in April 2009, and later the audio (but not the video) recording of that meeting.

9. I also recorded videos of Jason Brown, Esq., Senior VP and General Counsel's Office in Amex, who testified January 2009 under oath that Qing Lin told FischerJordan that "I don't think Peter Lindner can work at Amex," which again shows Qing gave "any information" about me,  in breach of ¶ 13 .

10. I affirm that I wrote almost those exact words to Mr. Brown some 3 years earlier in February 2006, and Mr. Brown denied that he agreed with either my quote or the interpretation that it was a breach of ¶13.

11. I affirm that I pointed out to Mr. Brown, Esq. in or about February 2006 that the Code of Conduct requires Qing to inform his manager, Ash Gupta, now the President of Banking at Amex, when Qing is in an ethical dilemma, such as whether to follow the contract signed by Ash or violate it in secret to FischerJordan.

12. I affirm that I pointed out to Secretary of the Corporation Stephen Norman, Esq. in or about December 2005 that the Code of Conduct requires Qing to inform his manager, Ash Gupta, now the President of Banking at Amex, when Qing is in an ethical dilemma, such as whether to follow the contract signed by Ash or violate it in secret to FischerJordan.

13. In filings to the Court, and in questions to both Qing and Mr. Brown, Esq., I noted that these two gentlemen were required as employees of Amex and as managers to report the breach or possible breach of ethics, laws or rules to their managers, who would then report it to the Secretary of the Corporation.

14. I affirm that I found out in or about May 2009, or as early as a few days after the April 27, 2009 Shareholder meeting that Qing had left for a competitor bank, presumably Chase Manhattan.

15. I affirm that I asked Ms. Park either directly or through my counsel about the status of Qing, being an employee or not, but was refused an answer.

16. In my mind and in my opinion, I felt that when Qing left Amex for a competitor, their interests diverged and Amex's counsel should not have represented Qing, especially if Qing wished to separately settle his individual involvement, and turn evidence over to the Amex Shareholders as to the non-working of the Amex Code of Conduct.

17. I affirm that I was informed this week (of March 22-25, 2010) by Amex's Collection Agency that I had a Fico score of 804, which according to the Fico Corporation is in the top 13% of the nation:



**National Distribution of FICO® Scores**

["Understanding Your Fico® Score, Fair Isaac Corporation", p.5]
http://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf

18. I also affirm that that same collection agency threatened that score, unless I paid them approximately $1,800 which I owed Amex in a dispute about a Personal Computer purchase during Amex's Double Warranty Program.

19. I affirm and enclose my Complaints of Thursday, March 25, 2010 to both NY State Attorney General Cuomo and the Federal Trade Commission for deceptive practices that Amex both reneged on its "double warranty", and on cancelling my card after I paid them approximately $7,000 on or about January 2010, and Amex refused to replace a twice defective personal computer, costing me over a thousand dollars in costs as well as months of lost productivity and errors.

20. I assert that it is conceivable that Amex is intentionally both nullifying my Amex card, not fulfilling its "Double Warranty" which has Amex pay for the 2nd year on a PC, and of attempting to do that so as to slow me down in filing with the Court, and in ruining my standing as a "member since 1986," which in the claustrophobic world of American Express is a bragging point.

21. I assert that Amex forced me to write a letter, as opposed to a fax or email, to handle the problem in January 2010, and then in February 2010 made me write another one (also by USPS snail mail), and to this date, as best I can tell, refuses to answer those complaints or get back to me as they pledged they would in many phone calls to Amex and their CEO's Executive Offices on Card Complaints in Feb 10 2010 through March 25, 2010.

22. I assert that numerous times over the past 4 years Ms. Park has acted in such a way as to block my access to the SEC, and to the officers of Amex with whom I must speak/write to get documentation for the SEC, and outright lied about such actions to The Court, thus causing me and my fellow Shareholders and fellow employees and fellow former employees of Amex to get redress for their grievances and to make Amex a better place for employees past and present and future.

23. I assert that in my opinion Ms. Schwartz mixed truth with opinion and did so in a mean-spirited way by suggesting that employees were better served by hiding problems, when Ms. Schwartz talked about the "negative" publicity garnered by uncovering and correcting flaws in how Amex treats its employees, and in particular how Amex treated me in 1998, and in 2000, and in 2005, and in 2009, as opposed to how in particular Amex rewarded for a period of 4 years a Senior VP who later admitted breaching the June 2000 Amex-Lindner Contract signed by his manager Ash Gupta, now the President of Banking at Amex.

24. I assert that in my opinion, I have abilities and circumstances far beyond those of most employees in the USA and that if such incidents as happened to me at Amex happened to them, they would have quit fighting Amex years ago and for less than a multiple of the $70,000 which Amex falsely and with bad intent bribed me to cease conflict with them in June 2000.

25. In my opinion, the circumstances that allowed me to persevere where others would have stopped were:

    a.  I am gay and not in the closet
    b.  I am literate
    c.  I am computer literate
    d.  I am verbal
    e.  I do not shrink from a fight when I'm right
    f.  I seek to correct injustice, whether against myself or others
    g.  I am single and do not have to support, for example, a wife, husband, or child.
    h.  I have sufficient savings to cover my unemployment caused by Amex
    i.  I can master some legal documents and legal research
    j.  I can use my computer skills to contact the SEC, lawyers and the public
    k.  I spurn small amounts of money in order to make a point
    l.  I am willing to spend $20,000 of my own money to get out of an alleged oral agreement which would have compensated me little, and hurt others
    m.  I am willing to confront authorities when needed
    n.  I can master the art of filing documents in a federal court without training
    o.  I can pull together newspapers, books and legal opinions over decades of US History which have relevance to my fight to do the right thing
    p.  I have a thick skin (sometimes) for withstanding the taunts of nasty agents of Amex (clerks, lawyers, phone operators)
    q.  I can persevere over a long time, in this case, over a decade.
    r.  I can combat giants, such as a 60,000 Amex with billions in profit
    s.  I can recognize the opposite of Noblesse oblige, where Amex would rather spend more to stop me than to fix their acknowledge wrongdoing
    t.  I can take repeated rebuffs, but then finally call Amex on their actions

I affirm that Amex has repeatedly tried to use false arguments and obstruction to stop my Shareholder Proposal and that as Jimmy Kimmel said to Jay Leno on TV: "Listen, Lucy, I'm not Charlie Brown. I don't fall for that trick"

26. I affirm I called Wells Fargo (WFC) and spoke to Tina, Rhonda, and their boss: Fawn Rose 704-427-5447 of the Retirement Service Division of Wells Fargo, whom I asked about the number of voting shares in the Amex Company Stock fund that WFC manages. She initially said she will call within the hour but could not give me that information. I was aghast that people who manage and control the money, don't even know the size of that pool of shares/ money they manage. I thought I'd find out if an employee Shareholder called for a transfer of shares and then asked if they could vote those shares, how they would answer. In other words, would WFC say "I don't know, or yes you can, or call Amex main number to find out," etc. I wanted to see if employee Shareholders would be able to vote for my proposal and would be able to find out the truth that "yes, you can vote those underlying shares as if you owned them as a Shareholder certificate." Or that WFC would then refer the employee Shareholder to a firm which handles the proxies. However, what Ms. Rose said was: "You're the first person who asked about voting these shares, and I've worked here for almost 10 years. Your plan does allow for in-kind stock distributions under certain conditions. " (time of call: 1:24 PM 3/26/2010)

27. Ms. Rose called back at Friday, March 26, 2010 2:18:48 PM and told me that "WFC filed their 5500 audit of 12/31/2008 Overall held shares in the pool was 13,494,410". Since I was told previously that the number of Amex shares was either 900,000,000 or 1,192,000,000, assuming the latter number, the number of employee (& former employee) held shares account for 1.50% or 1.13% of the votes, respectively. I calculate using the Yahoo! stock price for AXP (American Express) stock at $41 per share

to mean that Amex is controlling $553,270,810, or a half billion dollars of employee capitalization without representation.

28. I assert that when I tried 4 years ago, I was discouraged at how much effort it took to get information on if and then how to vote the underlying shares. To me, that was voter suppression, in the classic sense of the word when used in political elections in the USA. I thought we had handled that problem a long time ago. Instead, it was happening again in 2006, and now in 2010. We have here a concerted effort to deprive employee Shareholder's of their SEC right to vote the shares, as certified by Amex to the SEC [citation not available]. I consider it incredible that this problem has not been fixed in four years, and I suspect that Amex is capitalizing on it (in both senses of the word) to void the ability of the people to vote. Moreover, Amex is using that money as capital (the other sense of the word) on which to remain fluid and conduct business, without allowing for those people who own the shares their right to vote, in violation of promises made to the SEC, and presumably certified by Secretary of the Corporation Carol Schwartz, Esq. [citation not available, since I can't find my mailed share fund notice from year end 2009]

29. I assert that I was sexually harassed by Qing Lin in 1998, and that my colleague who was better looking, younger and muscular was also harassed that year on at least 2-3 times: first by Qing grabbing that guy's large bicep, and when Qing did that on another day after that guy and I talked, the guy did the same bicep grab on Qing, but squeezed harder and harder until Qing said "Ow, that hurts" and never grabbed the guy again. That guy told me to keep it secret since he values his career in Amex and advised me not to report Qing, since it would ruin my career. He later agreed that he was right, and I was stupid to stop Qing. These events were reported contemporaneously to me by that unnamed guy.

30. Later Qing's group had a party with liquor, and that guy went to the men's room, and Qing followed the guy in. They were the only two people in the line of urinals, and instead of following bathroom protocol (in the straight and sometimes in the gay world) of going to a urinal that is not immediately next to the person, Qing went right next to that guy and started urinating and looking down at my friend's penis. "What's up, Qing?," my friend asked, but Qing said nothing and kept staring at his penis. This is another example of improper behavior in an office, as well as sexual harassment, especially among grown men.

31. My friend later recounted that to a different buddy in his group at Amex, and that guy said: "Wow, maybe Peter Lindner is right about Qing." Meaning: that Qing was a closet gay who preyed upon people at work.

32. I assert that I told and wrote Joe Sacca of Skadden, Arps, Slate, Meagher & Flom LLP about his wrong statements to the court last year, but that Mr. Sacca did not agree and that Mr. Sacca indicated he did not (even now?) try to ask Ms. Park whether what I said was true or not.

33. I would include more here, but my time to file by 5pm is rapidly approaching.

Dated: New York, NY
March 26, 2010

By: _____
        Peter W. Lindner
        Plaintiff, *Pro Se*
1 Irving Place, Apt. G-23-C
New York, New York 10003

Home/ Fax:    212-979-9647
Cell:         917-207-4962
Email:        nyc10003@nyc.rr.com

Sworn to before me

March 26, 2010

_____
Notary Public

JERRY PAGOZZINO
Notary Public, State of New York
No. 01RA6001034
Qualified in Richmond County
Commission Expires Dec. 29, 20 13

29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Honorable Sidney H. Stein

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PETER W. LINDNER,

10 Civ. 2267 (SHS-AJP)

               Plaintiff,

     -against-

PLAINTFF CROSS-MOTION AND
REPLY TO AMEX RESPONSE ON
ORDER TO SHOW CAUSE

AMERICAN EXPRESS COMPANY

               Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Exhibit 1:  11 page document from email to Joe Sacca from Peter Lindner Tue 3/16/2010 6:17 PM,
entitled "Joe --Are you weaseling out of this.pdf"**

**Exhibit 2A:  Third Email Request May 1 2009 to Jean Park by Lindner requesting the April 26 2009 Shareholder meeting Transcript & DVD**

## Peter Lindner

From:    Park, Jean Y. [JPark@KelleyDrye.com]

Sent:    Friday, May 01, 2009 6:09 PM

To:      Peter Lindner

Subject: RE: Letter to Stephen Norman for DVD and transcript

I will inform the Company of your request and it will be treated like any other shareholder request.


-----Original Message-----
From: Peter Lindner [mailto:nyc10003@nyc.rr.com]
Sent: Friday, May 01, 2009 5:46 PM
To: Park, Jean Y.
Subject: Letter to Stephen Norman for DVD and transcript

Ms. Park:

According to the site:

　　　"If the webcast player has not launched within 5 seconds, please click here
　　　Unauthorized recording or downloading of this event is not permitted.
　　　© Copyright 2004 by Thomson Financial, Inc. All Rights Reserved. "

I wish
1) written authorization, and
2) the link to the 2009 Annual Shareholders' Meeting 04/27/09, which is not coming up.

Unless you as Amex's attorney just gave written authorization to record any Amex public event,
which I assume will be the case in case you change your mind.

Here's what I propose, so please have Mr. Norman reply:

Mr. Norman:

Please give me a DVD copy of the video of the 2009 Annual Shareholders' Meeting 04/27/09 and
its full transcript, including my shareholder proposal and Ken's comment in response.

　　　Regards,

　　　　　　Peter

Peter W. Lindner
1 Irving Place, Apt. G-23-C
NY, NY 10003
home: 212-979-9647
cell: 917-207-4962

—— Original Message ——
From: "Park, Jean Y." <JPark@KelleyDrye.com>
To: <nyc10003@nyc.rr.com>
Sent: Friday, May 01, 2009 4:49 PM
Subject: RE: 3rd request for Amex S/H Meeting of April 2009, with not even a courtesy of a reply.
Nor on Objection to USDJ Koeltl of MJ Katz ruling

Magistrate Judge Katz has never issued an order precluding you from
accessing publicly available documents.  Get it yourself.

——Original Message——
From: nyc10003@nyc.rr.com [mailto:nyc10003@nyc.rr.com]
Sent: Friday, May 01, 2009 4:07 PM
To: Park, Jean Y.
Subject: 3rd request for Amex S/H Meeting of April 2009, with not even a
courtesy of a reply. Nor on Objection to USDJ Koeltl of MJ Katz ruling


Ms. Park:

Please answer me on the video of the Annual Shareholders' Meeting of
April 27, 2009.

On the Amex website, it says :

"Presentations

By clicking on the links below, you can access the presentation
materials for that date, including a link to the webcasts which are
available for one year after the presentation date. If you have problems
opening the PDF files, right click on the file link and Save Target As.


2009
2009 Annual Shareholders' Meeting
04/27/09"

http://phx.corporate-ir.net/phoenix.zhtml?c=64467&p=irol-presentations

Thus, I should be able to get this publicly available document, but am
going through you as per MJ Katz's order.

If you refuse to discuss this, in violation of MJ Katz's individual
rules, I will ask for sanctions.

You have not replied. Perhaps you did not receive my other emails, like
you said of my Objection filed with USDJ Koeltl.  Have you gotten that
yet? If so, your time to reply is over as I see it, and my objection
should be granted by USDJ Koeltl, since you do not object, and you have
not filed a Memo of Law with your filing.

Peter

**Exhibit 2B:  March 5 2010 Email of Jean Park giving Lindner's attorney the April 2009 Transcript**

## Peter Lindner

| | |
|---|---|
| **From:** | Park, Jean Y. [JPark@KelleyDrye.com] |
| **Sent:** | Friday, March 05, 2010 4:56 PM |
| **To:** | 'breudlaw@optonline.net' |
| **Subject:** | Lindner v. American Express |

**Attachments:** AXP-Transcript-2009-04-27T14_00.pdf

Al -

I was unhappy to learn today that Lindner apparently filed an application with Magistrate Katz on February 24, 2010.  I never received a copy of this application and only learned of the application today because Lindner saw fit to forward it directly to the Company.  Lindner noted in his papers that you, as his attorney of record, were supposed to serve the papers on me.  I'm not sure what happened, but please provide me with a service copy of all filings that either you or Lindner submits to the Court.

Until you are relieved as counsel of record, you have an obligation to do so.  I, in turn, cannot communicate directly with Lindner while he is being represented.

On another, but related note, attached is a transcript of American Express' April 27, 2009 shareholder meeting.  I understand that Lindner has been demanding this transcript despite the fact that a recording of this entire meeting can be accessed and listened to on the Company's website.  So, here it is.

Jean

Jean Y. Park | Kelley Drye & Warren LLP
101 Park Avenue, New York, NY 10178
212.808.5019 | jpark@kelleydrye.com
www.kelleydrye.com

 Please consider the environment before you print this e-mail.

**Exhibit 3A:  Letter from Lindner to Ash Gupta of Feb 10 2006**

Clearly I was wrong that an investigation would cause Qing to be fired, and then Ash, and that by not cooperating, Ash would "miss the boat" of an amnesty to people who cooperate in an investigation.  Ash has gotten more than one registered letter, including at least one that was just rubber stamped instead of signed, which may be a way to avoid acknowledging receipt of the letter: plausible deniability.

Friday, February 10, 2006

Ash Gupta, Vice President
American Express
200 Vesey Street
NY, NY 10285

RE: Your turn to investigate Qing or face COC violations

Dear Ash,

It's been a while since we talked, as you can see from your refusing my phone calls in August 2005 to alert you that Qing Lin violated the agreement that YOU signed in June2000 between American Express and me.  In paragraph 13 of that agreement, you agreed that (among 6 others) Qing would not speak to any prospective employer of me [Peter Lindner] about my employment at Amex and would refer all inquiries to HR.

Now it turns out that not only did Qing violate this agreement, but he also violated the Amex "Code of Conduct" ("COC"-see excerpts attached) by not reporting to his manager this conflict of interest / attempted violation of an agreement .  His manager would have then informed Stephen P. Norman, the Corporate Secretary, who would render an opinion.  No doubt Mr. Norman would say to Qing: "Please follow the June 2000 Amex-Lindner agreement and refer Boaz Salik's request for information about Peter Lindner to HR and do not comment on him further."  Mr. Norman NEVER got a chance to give his opinion to Qing nor to his manager, since Qing[1] violated the code of conducts on this point.

Now you are being investigated also.  And you can mitigate your punishment / consequences by investigating this matter, including demanding to know from your people (does Qing report to you, directly or indirectly?) what did Qing know, and when did he know it.  If you determine that Qing did indeed speak to Boaz Salik of Fischer Jordan in April / May 2005 about me – which led to me not being offered a full time job at FJ – then you should remind Qing that it violates a document you signed, and that you should affirmatively report this investigation to Mr. Norman's office.  According to the "Code of Conduct"[2], you will be given more lenient treatment if you volunteer information and proactively stop violations of the code than if you wait for those charges to be proven against you.

Prosecutors in federal cases against Labor Union officials in the 1960's-1970's used a metaphor of a boat leaving the dock.  They urged the people to get on the boat

---

[1] "Q. Aside from these examples, what are some general rules or suggestions for me to follow when I am faced with a potential conflict?
**A.** Your instincts will usually tell you when a position that you or your family members are offered may conflict with your duties to the Company. The primary rule in such cases is simple: Always disclose, and when in doubt, ask. Contact the Corporate Secretary for a ruling."
[2] "The fact that you have reported the violation will be given consideration in determining appropriate disciplinary action, if any. In many cases, a prompt report of a violation can substantially reduce the adverse consequences of a violation for all involved — third parties, the Company and you."

before it departs, or else they will be stuck.  The boat was an impending point in the case where cooperating witnesses would get partial immunity.  Those left at the dock would get a more harsh treatment.

I am sending this to you by certified mail, return receipt requested, so that you cannot say you did not know that Qing told Boaz, and that Boaz told Trevor Barran, and that Trevor told me, and that I confirmed this with Trevor via email in July 2005, and confirmed it with Boaz face-to-face and via email in July/August 2005.  It is somewhat weak to just say it did not happen.  And, you should like to know, there may well be other testimony from another firm that would implicate Qing.  Ash, the matter was closed in June 2000, and Qing chose to open it five years later, perhaps with your knowledge, perhaps without it.


Your good reputation and your illustrative career may be imperiled by you lack of action.  In any case, now Mr. Norman's reputation and career are being involved since either he did not respond correctly to Qing and advised Qing in Apr/May2005 to speak to Boaz, or else Qing never told Mr. Norman and Mr. Norman's responsibility to monitor compliance with the "Code of Conduct" has been marred.  Mr. Norman is responsible, and his career at Amex will be imperiled if all these emails and notarized statements show a likely violation by Qing, who definitely did not do the right thing.


Sincerely yours,


Peter W. Lindner
1 Irving Place, Apt. G-23-C
NY, NY 10003
home: 212-979-9647
cell: 917-207-4962